[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 13, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14909

_____

D. C. Docket No. 02-03185-CV-HS-NE

BOBBY PROCTOR,

Plaintiff-Appellee,

versus

FLUOR ENTERPRISES, INC.,

Defendant-Appellant,

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 13, 2007)**

Before EDMONDSON, Chief Judge, HULL, Circuit Judge, and FORRESTER,[*]
District Judge.

---

[*]Honorable J. Owen Forrester, United States District Judge for the Northern District of
Georgia, sitting by designation.

HULL, Circuit Judge:

In this diversity case, defendant Fluor Enterprises, Inc. ("Fluor") appeals the entry of judgment of nearly $2.5 million following a jury trial on plaintiff Bobby Proctor's negligence claim under Alabama law. Fluor contends that it is entitled to (1) judgment as a matter of law because Proctor failed to establish that Fluor breached a duty of care that proximately caused Proctor's injuries arising from a manufacturing plant accident or, alternatively, (2) a new trial based on the district court's erroneous decisions to exclude evidence on the borrowed servant doctrine and admit expert testimony on the cause of Proctor's stroke. After review and oral argument, we affirm the district court's denial of Fluor's motion for judgment as a matter of law but conclude that Fluor is entitled to a new trial.

## I. BACKGROUND

Because this appeal involves issues about the sufficiency of the evidence, we first outline the evidence presented at trial.

### A. Decatur Plant Accident

Plaintiff Proctor testified about the manufacturing plant accident and his subsequent injuries. Proctor worked at Solutia, Inc. ("Solutia") in its acrylic manufacturing plant in Decatur, Alabama. Proctor had worked at the plant for over thirty-five years, the last ten years as a senior operator. Proctor, as a Solutia senior

operator, oversaw six "TM" machines, which are a series of connected tubs that contain chemical solution baths used in the manufacture of acrylic fiber. Proctor was responsible for maintaining quality control by recording readings related to temperature, pressure, and speed of the machines.

On January 30, 2002, Solutia's night supervisor at its Decatur plant, John Peck, told Proctor that one of the TM machines had fluctuating pressure problems and that Proctor should call an electrical and instrumentation ("E&I") technician to troubleshoot the machine. E&I technicians were responsible for diagnosing problems and making repairs to the machines. Solutia had contracted with Fluor, an engineering and construction contractor, to provide construction, maintenance, and engineering technicians to Solutia.

Proctor radioed for E&I technicians, and Darrell Terry and Charles Lawrence soon arrived. Terry was a direct Solutia employee, and Lawrence was a Fluor contract employee working full time at Solutia's Decatur plant. Lawrence had responded to Proctor's requests for an E&I technician numerous times and carried a manual temperature probe. Proctor had witnessed Lawrence take a manual temperature of the solution bath in troubleshooting TM machines approximately a hundred times.

After troubleshooting the machine, Lawrence told Proctor that the vortex

3

breaker in the TM machine was clogged and that Proctor needed to clean it. Proctor had previously checked vortex breakers for pluggage over a hundred times, and he discovered that the breaker was actually clogged only twenty percent of those times.

Based on Lawrence's diagnosis, Proctor prepared to check the solution bath for pluggage. Proctor put on a neoprene glove, a metallic sleeve, and a rubber glove to protect himself from the hot liquid bath. Proctor noticed that the temperature controller on the TM machine read 96 degrees Celsius, one degree below the desired temperature and four degrees below the solution bath's boiling point of 100 degrees Celsius. Proctor reduced the pressure and temperature on the control panel about twenty percent. According to Proctor, the solution bath was not boiling out or spilling. As Proctor reached into the bath, the solution bath vaporized and blew out over him, causing second-degree burns over twenty percent of Proctor's body. Proctor testified that he had never seen a similar accident during his tenure as a senior operator. Proctor was rushed first to a local hospital and then to a burn unit in Birmingham, where he remained for twelve days.

Peck, Solutia's night supervisor who reported the TM machine malfunction to Proctor, testified that E&I technicians carry manual temperature probes with them and measure the solution bath temperature when troubleshooting TM

4

machines.  Peck previously had seen Lawrence measure the bath temperature when troubleshooting pressure problems on TM machines.

Lawrence testified that after receiving Proctor's request for troubleshooting, he first checked the liquid level in the solution bath and found no problem. Lawrence checked the pressure indicator and then walked down to the basement to inspect the machine pumps and pipes.  Lawrence had "never seen the pipes shake like they were shaking" and called for Terry to join him in the basement.  Based on this violent shaking, Lawrence concluded that the pump was cavitating.  Lawrence returned upstairs and informed Proctor that, in his opinion, the vortex breaker was clogged and needed cleaning.  Lawrence admitted that he never took a manual temperature of the solution bath.  Lawrence had taken a manual temperature of the solution bath as part of his troubleshooting duties on over a hundred occasions, but he claimed that he never took a temperature when troubleshooting a pressure problem.

Proctor also presented the testimony of Scott Curry, an E&I technician at Solutia's Decatur plant.  Curry testified that E&I technicians are responsible for troubleshooting and diagnosing problems with the TM machines and that senior operators correct problems based on the E&I technicians' diagnoses.  According to Curry, the three potential causes of pump cavitation are low liquid level, improper

temperature, and pluggage. When Curry troubleshoots a pressure problem, he first checks the liquid level of the bath and the pressure gauges and then takes a manual temperature of the solution bath using a digital thermometer that every E&I technician carries. If the liquid and temperature levels are correct, Curry concludes that there is pluggage in the machine. Curry confirmed that there was no written procedure on how to troubleshoot a TM machine.

Dr. Marvin McKinley, Ph.D., testified as Proctor's expert witness on the cause of the accident. Dr. McKinley opined that the accident occurred because the temperature controller failed and overheated the solution. The solution then vaporized, and the excess temperature caused the solution to blow out from the pump. Dr. McKinley identified the three causes of pump cavitation as low liquid level, high temperature, and an obstruction in the machine. Dr. McKinley claimed that the "logical progression" to troubleshoot pump cavitation would be to check the liquid and temperature level first because these potential causes were easy to detect, while a clog is more difficult to uncover. According to Dr. McKinley, had Lawrence used his probe thermometer to perform a manual check on the TM machine's temperature, the excessive temperature would have been discovered and the accident could have been avoided.

Proctor also introduced into evidence a shift report from the Decatur plant

on February 1, 2002, the first day in which the malfunctioning TM machine was restarted after the accident. This shift report stated that the machine's pumps began cavitating again. Solutia personnel determined that the temperature controller was malfunctioning, causing the actual bath temperature to be 101 degrees Celsius, which was four degrees higher than the controller set point. No clog in the vortex breaker was noted.

Fluor called Terry, who worked with Lawrence as an E&I technician, as its witness. Terry described his efforts to troubleshoot the malfunctioning TM machine at the time of the accident. When Terry joined Lawrence in the basement, he noticed that the pumps were vibrating more violently than he had ever seen them vibrate. After consulting with Lawrence and a mechanic, Terry returned upstairs and told Proctor he was going to get a hook to check for a clog in the solution bath. Terry claimed that he did not know at the time that excess temperature could cause the pump cavitation, but he conceded that he now knows that temperature is a possible cause.

**B.    Medical Evidence**

Proctor described his burn treatment at the Birmingham hospital. During his twelve-day hospital stay, Proctor was wrapped in bandages and underwent "extremely" painful treatment. Dr. James M. Cross, M.D., the medical director of

the Birmingham burn unit, testified that Proctor suffered scalding burns over approximately twenty percent of his body and was in constant pain during his entire hospital stay. Proctor underwent daily hydrotherapy, a painful process that washed off loose skin from the burns. Dr. Cross prescribed physical therapy after the hospitalization.

Following his release from the hospital, Proctor was confined to his bed at home for three to four weeks. By March, the pain from Proctor's burns had mostly gone away, but he testified that he still suffers blisters and irritation from the burns. Proctor continued a regular course of outpatient treatment for his burns and physical and occupational therapy from soon after his February 11 hospital discharge until April 8, 2002. Proctor suffered a stroke on April 10, 2002. After several days of hospitalization, Proctor underwent physical, speech, and occupational therapy for eighteen weeks. Proctor has not returned to work since the accident.

Dr. Darin K. Bowling, D.O., testified about Proctor's stroke. Dr. Bowling is a licensed doctor of osteopathy with a family practice and has treated approximately a hundred stroke patients. To ascertain the cause of Proctor's stroke, Dr. Bowling performed a complete physical examination, including diagnostic testing with a computed tomography ("CT") scan, echocardiogram, and

magnetic resonance imaging ("MRI") scan. Dr. Bowling considered Proctor's history of hypertension but concluded that the hypertension was under control with medication and that it was not the main cause of his stroke. Based on differential etiology, Dr. Bowling ruled out a hemorrhagic stroke and determined that Proctor suffered an embolic stroke arising from blocked arteries. Dr. Bowling concluded that the main cause of Proctor's stroke was likely the change in lifestyle and stress related to the Solutia accident and burns. As a result of the stroke, Proctor was totally disabled. However, on cross-examination, Dr. Bowling stated that he was not a stroke expert and had no special training in strokes.[1]

Dr. Charles D. Coffee, M.D., testified as Proctor's family physician from 1992 to 2002. According to Dr. Coffee, Proctor had high blood pressure and took blood pressure medication prior to August 1992. Based on Proctor's lower blood pressure in September 1992, Dr. Coffee reduced his blood pressure medication and subsequently prescribed no more blood pressure medication. Dr. Coffee also diagnosed Proctor as suffering post-traumatic stress syndrome from his military

---

[1]On appeal, Fluor contends that it is entitled to a new trial because the district court should have excluded Dr. Bowling's testimony on the cause of Proctor's stroke as unreliable expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993). Because, as discussed later, we find that a new trial is warranted based on the district court's erroneous exclusion of evidence about Solutia's care, control, custody, and supervision of Lawrence, we need not consider whether the district court erred in admitting Dr. Bowling's testimony and express no opinion on that issue, especially given the district court's discretion to revisit the issue in the new trial and the plaintiffs' discretion as to the selection of experts at the new trial.

experience in Vietnam.

## C.    Pre-trial Proceedings

In December 2002, Proctor filed a complaint against Fluor, alleging negligence arising out of Lawrence's failure to check the temperature and make a proper diagnosis of the malfunctioning TM machine.  In its January 2003 answer, Fluor denied the material allegations and asserted, inter alia, the affirmative defense that Proctor's claims against Fluor were barred by the Alabama Workers' Compensation Act ("AWCA"), Ala. Code §§ 25-5-1 to -340.

Part of this appeal involves the fact that while Fluor's answer referred to the AWCA's exclusivity bar, Fluor's answer made no mention of the borrowed servant doctrine.  Under Alabama law, the borrowed servant doctrine recognizes that an employee may be in the general service of and paid by his employer (Fluor) and nevertheless be transferred for a particular work assignment to a third-party employer (Solutia).  See U.S. Fid. & Guar. Co. v. Russo Corp., 628 So. 2d 486, 488 (Ala. 1993).  Accordingly, the third-party employer that borrowed the employee accepts liability for the employee's work on that particular assignment, and the general employer is not liable.  See id.  "The ultimate test in determining whether an employee has become a loaned servant is a determination of whose work the employee was doing and under whose control he was doing it."  Id. at

10

489.

Discovery proceeded for about six months. During discovery, Fluor deposed Lawrence and several Solutia employees about Lawrence's work duties and whether Fluor or Solutia had care, control, custody, and supervision over Lawrence's work at the plant at the time of the accident.

On October 29, 2003, Fluor moved for summary judgment, arguing, inter alia, that Proctor had failed to produce sufficient evidence of negligence and that his claims were barred by the AWCA's exclusivity provisions pursuant to the borrowed servant doctrine. Fluor argued that Lawrence was a loaned servant of Solutia and thus a co-employee of Proctor and that, under the AWCA, Proctor could not sue Lawrence (his co-employee) or, in turn, Fluor, but instead could pursue only workers' compensation.

With its motion for summary judgment, Fluor also proffered forty-one pages of deposition testimony and two affidavits from Lawrence, five Solutia employees, and a Decatur plant shop foreman employed by Fluor. According to this deposition testimony, Lawrence submitted his timesheets to Fluor's shop foreman at the Decatur plant and received his paychecks from Fluor. Fluor's contract with Solutia stated that Fluor, as an independent contractor, maintained "complete control" of employees and that Fluor employees did not become agents or

11

employees of Solutia.[2]

However, Fluor's evidence also showed that Lawrence worked permanently under the supervision of Solutia in Solutia's maintenance department and received his daily work assignments directly from Solutia. Solutia did not distinguish between Solutia employees and Fluor contract employees when distributing work assignments. Additionally, Solutia provided all the tools and equipment for Lawrence's work duties and trained him on the operation of Solutia machines. Although Fluor retained the ultimate power to terminate employees, Solutia previously had asked Fluor to remove several contract employees at the Decatur plant, and Fluor complied.

In his November 12, 2003 response to Fluor's motion for summary judgment, Proctor asserted that Fluor's answer had not pled the borrowed servant doctrine as an affirmative defense, and he thus moved to strike consideration of the borrowed servant doctrine pursuant to Federal Rule of Civil Procedure 8(c).[3]

---

[2]Specifically, Fluor's contract with Solutia stated:
Contractor [Fluor] is and shall remain an independent contractor in the performance of the Work, maintaining complete control of his workmen and operations. Neither Contractor nor anyone employed or engaged by him shall become an agent, representative, servant or employee of Solutia in the performance of the Work or any part thereof.

[3]Federal Rule of Civil Procedure 8(c) provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense."

In its November 26, 2003 reply, Fluor argued that it implicitly pled the borrowed servant doctrine by asserting in its answer that "[s]ome or all of the plaintiff's claims may be barred by the Alabama Workers Compensation Act." Fluor also argued that, notwithstanding its failure to plead the borrowed servant doctrine explicitly, Proctor had notice of the defense by virtue of the extensive depositions taken about Solutia's care, control, custody, and supervision of Lawrence and that Proctor would suffer no prejudice from Fluor raising the defense.

On September 8, 2005, the district court denied Fluor's motion for summary judgment on the negligence claim and granted Proctor's motion to strike consideration of the borrowed servant doctrine.[4] The district court determined that the borrowed servant doctrine is a separate affirmative defense from the AWCA's exclusivity bar because the borrowed servant doctrine applies even to injuries not covered under the AWCA. The district court found that "regardless of whether the Plaintiff realized, recognized, or inquired as to facts that may give rise to such a defense, the Defendant maintains a burden of pleading such an affirmative defense in its first response." Because Fluor failed to plead the borrowed servant doctrine

---

[4]Proctor's complaint also made a claim for wantonness. The district court granted Fluor's motion for summary judgment on the wantonness claim after Proctor conceded that he had no evidence to establish the culpable mental state required for wantonness under Alabama law. Proctor has not cross-appealed that ruling.

as an affirmative defense in its answer, the district court found that Fluor waived the defense pursuant to Federal Rule of Civil Procedure 8(c).

On September 16, 2005, Fluor requested leave to amend its answer to add the borrowed servant defense, but the district court denied the motion. The district court also denied Fluor's effort to include the borrowed servant doctrine in the final pre-trial order filed on October 14, 2005.

Five days before trial, the district court held a hearing on various motions in limine filed by both parties. The district court granted Proctor's motion to exclude testimony that Lawrence was under the care, control, custody, and supervision of Solutia on the basis that such evidence was relevant only to the borrowed servant defense, which the court already had determined that Fluor had waived. The district court denied Fluor's motion to exclude expert testimony from Dr. Bowling.

## D.     Trial

On February 13, 2006, the jury trial began. At the close of Proctor's case, Fluor moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a). Fluor contended that (1) Proctor had failed to establish that Lawrence breached any duty or that the accident was foreseeable, and (2) Dr. Bowling's testimony did not establish stroke causation. The district court reserved ruling on Fluor's motion.

At the close of all the evidence, Fluor reasserted its motion for judgment as a matter of law, which the district court denied. Proctor also moved for judgment as a matter of law. The district court granted Proctor's motion only on the respondeat superior issue, concluding as a matter of law that Lawrence was working in the scope of his duties as a Fluor employee at the time of Proctor's incident.

Following deliberations, the jury found Fluor liable for Proctor's accident and awarded Proctor $1,401,351 as damages for his burns and $1,018,000 as damages for his stroke, for a total award of $2,419,351. The district court entered judgment on the jury's verdict.

## E.  Post-Trial Proceedings

Post-trial, Fluor renewed its motion for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b), and also moved for a new trial, pursuant to Federal Rule of Civil Procedure 59(a). Fluor contended that it was entitled to judgment as a matter of law based on insufficient evidence of Lawrence's negligence and of the cause of Proctor's stroke. Fluor argued, in the alternative, that it was entitled to a new trial based on the district court's error in admitting Dr. Bowling's testimony on stroke causation and in excluding testimony about Lawrence's work conditions and the borrowed servant doctrine. The district court denied Fluor's motion. Fluor timely appealed.

15

## II. DISCUSSION

## A.      Sufficiency of the Evidence of Negligence

Under Alabama law, "in order to prove a claim of negligence a plaintiff must establish that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused injury or damage to the plaintiff." Zanaty Realty, Inc. v. Williams, 935 So. 2d 1163, 1167 (Ala. 2005) (quotation marks and citation omitted).  On appeal, Fluor challenges whether Proctor presented sufficient evidence to establish the three of the elements of negligence: duty, breach, and causation.[5]

### 1.      Duty

First, Fluor contends that the accident that injured Proctor was not foreseeable and that Lawrence had no legal duty to prevent that type of harm.  "In Alabama, the existence of a duty is a strictly legal question to be determined by the

---

[5]We review a district court's denial of a Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law de novo.  Christopher v. Florida, 449 F.3d 1360, 1364 (11th Cir. 2006).  We view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1177 (11th Cir. 2005), aff'd, __ U.S. __, 127 S. Ct. 2162 (2007).  Judgment as a matter of law "is appropriate when a plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action."  Christopher, 449 F.3d at 1364.  "But if there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied."  Id. (quotation marks and citation omitted).

16

court."[6] Pritchett v. ICN Med. Alliance, Inc., 938 So. 2d 933, 937 (Ala. 2006) (quotation marks and citation omitted). "The ultimate test of a duty to use care is found in the foreseeability that harm may result if care is not exercised." Zanaty Realty, Inc., 935 So. 2d at 1168 (quotation marks and citation omitted).

Fluor asserts that Proctor provided no evidence of foreseeability because this specific type of accident had never happened before January 30, 2002. Fluor stresses that even Proctor confirmed on cross-examination that he "had never seen an accident like this" in his twelve years working with the machines and that "no one could expect this accident to happen . . . ."

However, under Alabama law, in determining foreseeability, "it is not necessary to anticipate the specific event that occurred, but only that some general harm or consequence would follow." Smith v. AmSouth Bank, Inc., 892 So. 2d 905, 910 (Ala. 2004). The fact that no such blow-out accident had happened in the past is not dispositive. If Proctor presented evidence that some harm was foreseeable when care is not exercised, it does not matter that a similar blow-out had not happened previously. See Lance, Inc. v. Ramanauskas, 731 So. 2d 1204,

---

[6]Proctor disputes whether duty is a question of law, arguing that although duty is normally a legal question, "it is not error to submit the question to the jury if the factual basis for the question is in sufficient dispute . . . ." Pritchett v. ICN Med. Alliance, Inc., 938 So. 2d 933, 937 (Ala. 2006) (quotation marks and citation omitted). However, the district court did not submit the question to the jury; instead, the district court made a legal determination that Lawrence had a duty to diagnose the TM machine in a non-negligent manner and only asked the jury to find whether Lawrence was negligent.

17

1208-10 (Ala. 1999) (concluding that it was foreseeable that someone might be electrocuted by a vending machine, despite no reports of prior electrocution deaths involving those vending machines, when the defendant did not follow the safety manual's installation instructions). Accordingly, Proctor did not need to show that a blow-out was a foreseeable result of a malfunctioning TM machine, but only that some harm would follow from improper troubleshooting of a malfunctioning TM machine.

And, Proctor presented sufficient evidence that some harm foreseeably could result if due care was not exercised in troubleshooting the TM machine. Lawrence and Terry knew that the TM machine contained a heated chemical solution. They admitted that they had never before seen a TM machine's pumps shake as violently as they did before the accident. Lawrence and Terry also carried a digital thermometer designed to check the manual temperature of the solution bath, indicating the risk of potential overheating. Dr. McKinley testified that a failure in the TM machine's temperature controller would cause the chemical solution to heat above the normal operating temperature, vaporize, and blow out of the pump. The safety equipment that Proctor donned before reaching into the hot chemical bath also highlights the inherent danger of an overheated chemical solution. Viewing the evidence in the light most favorable to Proctor, it was reasonably

18

foreseeable that some harm would result from Lawrence's improper diagnosis of a malfunctioning, violently shaking TM machine that was filled with a superheated chemical solution and in telling a machine operator (Proctor) to reach into a such a machine. The district court did not err in determining that Lawrence owed Proctor a duty of ordinary care.

2.      Breach

Even if a duty of care existed, Fluor contends that there was no proof that Lawrence breached this duty. Specifically, Fluor contends that because there is no prescribed priority order in troubleshooting TM machines, Lawrence was not negligent for attempting to address one of the three potential causes of pump cavitation–i.e., pluggage–when the accident occurred.

Under Alabama law, whether a party breached a legal duty is a question of fact for the jury. See Pritchett, 938 So. 2d at 938. Viewing the evidence in the light most favorable to Proctor, we conclude that there was sufficient evidence that Lawrence breached his duty of care by telling Proctor to check for pluggage without ever manually checking the temperature.

For example, Dr. McKinley testified that because of the ease of checking the solution level and the solution temperature, it was a "logical progression" to check these two possible causes of pump cavitation prior to checking for pluggage, which

19

cannot be detected easily. Curry testified that this was the exact progression he followed as an E&I technician–he checked the liquid level and temperature prior to checking for pluggage when troubleshooting pressure problems in TM machines. Additionally, Curry testified that each E&I technician carried a digital thermometer designed to take the manual temperature of solution baths.

Furthermore, regardless of whether there was a prescribed order of troubleshooting, it is undisputed that Lawrence never checked one of the three potential causes of the pump cavitation (and one of the easiest potential causes to detect) prior to making a diagnosis that pluggage was the problem and telling Proctor to check for pluggage. Based on all this testimony, the jury reasonably could find that Lawrence breached his duty of care by failing to check the solution temperature manually prior to telling Proctor to clean the vortex breaker.

3.     Causation

Finally, Fluor contends that Proctor provided no evidence that there was a temperature problem or that excessive temperature caused the chemical blow-out. Fluor stresses that Proctor and Peck did not observe any chemical solution boiling prior to the accident, which is an indicator of excess temperature.

Proctor, however, presented sufficient evidence from which a jury reasonably could find that Lawrence's failure to diagnose excess temperatures in

the TM machine caused the chemical accident. First, the shift report from February 1, 2002, which was the first day that the malfunctioning TM machine was restarted following the accident, noted that the pump was cavitating again and indicated that the temperature controller was overheating the chemical solution to a boiling temperature of 101 degrees Celsius. No pluggage or liquid level problem was noted on the report.

Most importantly, Dr. McKinley provided an expert opinion on the accident's cause after reviewing depositions, the February 1 shift report, photographs taken of the machine at the Solutia site, and articles on pumps and liquid vaporization. Based on his review of this material, Dr. McKinley opined that "[t]he temperature controller failed and overheated the solution. . . . Once [the solution] got into the pump, this excess temperature caused it to blow out the suction." Dr. McKinley averred that the accident could have been prevented by checking the temperature manually, which would have revealed the excess temperature. Dr. McKinley also testified that the accident could not have been caused by any other factor besides excess temperature. The jury was entitled to credit Dr. McKinley's testimony, and Fluor provided no expert testimony to counter Dr. McKinley's testimony on causation. For all of these reasons, the jury reasonably could have found that Lawrence's failure to diagnose the excess

21

temperature caused the accident that injured Proctor.

Viewing the evidence and drawing all reasonable inferences in the light most favorable to Proctor, we conclude that Proctor presented sufficient evidence for a reasonable jury to find that he established all elements of negligence. Accordingly, we affirm the district court's denial of Fluor's motion for judgment as a matter of law on the negligence claim.

## B.    Evidence of Lawrence's Work Conditions

Alternatively, Fluor contends that errors in the district court's evidentiary rulings substantially affected the jury's verdict and require a new trial.[7] Specifically, Fluor argues that the district court erred in excluding its proffered testimony about how Lawrence was under the care, control, custody, and supervision of Solutia.

The district court excluded this evidence on the grounds that (1) this evidence was relevant only to the borrowed servant doctrine, and (2) the court already had barred the borrowed servant defense due to Fluor's failure to plead that affirmative defense in its answer.[8] The district court also rejected Fluor's assertion

---

[7]We review a district court's evidentiary rulings for abuse of discretion. See United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir.), cert. denied, __ U.S. __, 127 S. Ct. 2964 (2007).

[8]The district court stated that "[t]he only reason I can see for this to come in is to go to the borrowed servant issue, which I have already determined in writing . . . is not a part of this trial."

22

that, even without the borrowed servant doctrine, this testimony was relevant to Proctor's negligence claim.

To gain a reversal based on a district court's evidentiary ruling, a party must establish that (1) its claim was adequately preserved; (2) the district court abused its discretion in interpreting or applying an evidentiary rule; and (3) this error affected "'a substantial right.'" United States v. Stephens, 365 F.3d 967, 974 (11th Cir. 2004) (quoting Fed. R. Evid. 103(a)). We conclude that Fluor has satisfied all of these requirements.

### 1. Preservation of Objection

Fluor properly preserved its objection to the district court's exclusion of evidence about Lawrence's work conditions. To preserve an objection to the district court's exclusion of evidence, "the substance of the evidence [must be] made known to the court by offer or [be] apparent from the context within which questions were asked." Fed. R. Evid. 103(a)(2). Once the court makes a definitive ruling excluding the evidence, a party need not renew its objection or offer of evidence to preserve the issue on appeal. See Fed. R. Evid. 103(a). Here, in response to Proctor's motion to strike, Fluor objected and proffered forty-one pages of deposition testimony and two affidavits from seven fact witnesses relating to Lawrence's work duties and supervision. Fluor also objected to Proctor's

23

motion in limine to exclude this same evidence. On appeal, Fluor raised this same issue in its initial brief. Therefore, the issue was properly preserved.

### 2. Abuse of Discretion in Evidentiary Rulings

We next consider whether the district court abused its discretion in concluding that the evidence about Solutia's care, control, custody, and supervision of Lawrence was irrelevant because Fluor had waived the borrowed servant defense. No one now disputes that, if Fluor could raise that defense, then evidence of Lawrence's work conditions was relevant and should have been admitted. Therefore, the underlying question on this evidentiary issue actually becomes a procedural issue about whether the district court properly concluded that Fluor waived the defense.[9]

Federal Rule of Civil Procedure 8(c) states that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense." Fed. R. Civ. P. 8(c); see also Steger v. Gen. Elec. Co., 318 F.3d 1066, 1077 (11th Cir. 2003). In diversity actions, we look to state law to inform the determination of whether a certain defense is "any other

---

[9]We review a district court's procedural ruling on waiver of an affirmative defense for abuse of discretion. E.E.O.C. v. White & Son Enters., 881 F.2d 1006, 1009 (11th Cir. 1989). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

matter constituting an avoidance or affirmative defense" under the federal rule.

See Troxler v. Owens-Illinois, Inc., 717 F.2d 530, 532 (11th Cir. 1983); Morgan Guar. Trust Co. v. Blum, 649 F.2d 342, 344 (5th Cir. Unit B 1981) ("In diversity of citizenship actions, state law defines the nature of defenses, but the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs.").[10] Under Alabama law, the borrowed servant doctrine is an affirmative defense for which the defendant bears the burden of pleading and proof. See Hosea O. Weaver & Sons, Inc. v. Towner, 663 So. 2d 892, 896-97 (Ala. 1995). Thus, we accept that the borrowed servant doctrine is an affirmative defense covered by Rule 8(c) in this case.

In general, a party's failure to raise an affirmative defense in the pleadings results in a waiver of the defense. See Steger, 318 F.3d at 1077. In deciding waiver issues under Rule 8(c), this Court in some cases has examined whether a plaintiff had notice of the unpled defense or was prejudiced by the lack of notice. See Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311, 1321 n.4 (11th Cir. 2006) (concluding that a plaintiff is not prejudiced by a defendant's failure to comply with Rule 8(c) if the plaintiff has notice of the affirmative defense by some other

---

[10]This Court has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

25

means), cert. denied, __ U.S. __, 127 S. Ct. 2139 (2007); Grant v. Preferred Research, Inc., 885 F.2d 795, 797-98 (11th Cir. 1989) (same); Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988) (examining whether "the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it" (citing Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350, 91 S. Ct. 1434, 1453 (1971))); Jones v. Miles, 656 F.2d 103, 107 n.7 (5th Cir. Unit B 1981).

On appeal, Fluor contends it implicitly pled the borrowed servant doctrine in its answer by claiming an affirmative defense under the AWCA's exclusivity provisions, because the only basis for asserting an affirmative defense under the AWCA's exclusivity provisions would have been under the theory that Lawrence was a borrowed servant of Solutia and thus a co-employee of Proctor. Fluor also contends that Proctor had other notice of the defense and was not prejudiced. The district court concluded that Fluor had not actually pled the defense and thus waived the defense "regardless of whether the Plaintiff realized, recognized, or inquired as to facts that may give rise to such a defense . . . ." The district court said nothing about, much less made a finding about, whether Proctor, in fact, either had notice of Fluor's borrowed servant defense or would be surprised and prejudiced. Instead, the district court considered Proctor's notice of the defense to

26

be unimportant.

We conclude that, given the circumstances presented in this case, the district court abused its discretion by concluding that Fluor waived the borrowed servant defense by failing to plead it separately in its answer. The general rule of waiver is more easily applied when a party fails to set forth one of the nineteen defenses specifically listed in Rule 8(c); waiver becomes less clear when a party fails to assert affirmatively some "other matter" that pre-existing federal case law has not clearly construed as "constituting an avoidance or affirmative defense" under Rule 8(c). Here, we can find no pre-existing federal case law in this Circuit discussing Alabama's borrowed servant doctrine under the federal rule.

Moreover, although we make no determination about the validity of Fluor's "implicit pleading" argument, we do note that the results in some Alabama cases arguably support Fluor's contention that, because its putative servant Lawrence was immune from suit under the AWCA, no liability can be visited upon Fluor as the putative master. See Towner v. Hosea O. Weaver & Sons, 614 So. 2d 1020, 1022-23 (Ala. 1993) ("If Hilliard was a loaned servant from Weaver to B & G, then Hilliard would be Towner's co-employee, and the . . . action [against Weaver] would be barred by the . . . [AWCA]"); Gunnels v. Glenn Mach. Works, Inc., 547 So. 2d 448, 449 (Ala. 1989) ("If Hall was, in fact, a loaned servant to F & G, then

27

he would be considered a co-employee of Tony Gunnels, and the Gunnelses' action based on negligence would be barred by the exclusivity provisions of the [AWCA].").  Thus, we cannot say that even Alabama law clearly establishes that pleading the AWCA's exclusivity bar was insufficient to raise the borrowed servant issue here.  This case is not one in which the defendant had to know that it was violating a sharp-edged procedural rule when it failed to spell out the borrowed servant doctrine as a separate affirmative defense in its answer.

In a case like this one, the reality of notice and the reality of prejudice in fact must be considered.  The record supports the view that Proctor had notice of Fluor's borrowed servant defense and was not prejudiced.  Fluor conducted depositions of seven fact witnesses relating to Solutia's care, control, custody, and supervision of Lawrence, and Proctor cross-examined witnesses about Lawrence's work conditions.  See Hassan, 842 F.2d at 263-64.  In addition, Fluor specifically raised the borrowed servant doctrine in its summary judgment motion filed in October 2003, which was long before any trial date had been set or even a pre-trial order entered in October 2005 and indeed more than two years before the February 2006 trial.  Under these circumstances, the district court erred in declining to consider whether the plaintiff actually had been prejudiced by the defendant's failure to plead the borrowed servant defense expressly in the answer.  In turn,

because the record shows that Proctor, in fact, had ample notice of the defense, the district court erred in excluding evidence of Lawrence's work conditions.[11]

### 3.    Effect on Substantial Rights

Although the district court erred in excluding evidence about Solutia's care, control, custody, and supervision of Lawrence, an erroneous evidentiary ruling is a basis for reversal only if the complaining party's substantial rights were affected. See Tran v. Toyota Motor Corp., 420 F.3d 1310, 1316 (11th Cir. 2005) ("We will only reverse a district court's ruling concerning the admissibility of evidence where the appellant can show that the judge abused his broad discretion and that the decision affected the substantial rights of the complaining party." (quotation marks and citation omitted)). To satisfy this standard, Fluor bears the burden of proving that the error "probably had a substantial influence on the jury's verdict." Stephens, 365 F.3d at 977 (quotation marks and citation omitted).

Because Alabama law recognizes the borrowed servant doctrine as a complete defense to liability, we conclude that the exclusion of Fluor's evidence

---

[11]Fluor claims that the district court improperly struck its borrowed servant defense both at the summary judgment phase and also at the pre-trial and trial stages, stressing our decision in Grant. Because Proctor had notice of the borrowed servant defense at the summary judgment stage after Fluor had conducted depositions about Solutia's control and supervision of Lawrence and because the district court excluded this evidence at trial based solely on its prior decision to strike consideration of the borrowed servant doctrine at the summary judgment stage, we need not address whether prejudice would result if Fluor had not filed the summary judgment motion based on the borrowed servant defense and only raised that defense for the first time in the pre-trial order.

about Solutia's care, control, custody, and supervision of Lawrence precluded the jury from considering that defense and thus had a substantial impact on the jury's verdict. To demonstrate that impact, we review three Alabama cases upholding the borrowed servant doctrine as a complete defense to liability. In Hendrix v. Frisco Builders, Inc., 213 So. 2d 208 (Ala. 1968), the defendant Tractor Company appealed a jury verdict against it after the state trial judge did not read its requested jury instruction on the borrowed servant doctrine. See id. at 208-09. Three employees, in the general employment and on the payroll of the Tractor Company, were attempting to install a butane tank on the plaintiff's property, when the tank caught fire and damaged the plaintiff's property. Id. at 209. The acting manager of the Gas Company, which provided the butane tank, asked the three employees to deliver and set up the tank and agreed to pay the employees in cash. Id. The Tractor Company gave them permission to install the tank, but the Tractor Company had no interest in the installation of the tank. Id. At the time of the accident, the three employees operated solely under the instructions of the Gas Company's acting manager. Id. at 209-10. However, the motor vehicle used to transport the tank was the property of the Tractor Company. Id. at 210.

Based on this evidence in Hendrix, the Alabama Supreme Court concluded that the three men were in the employment of the Gas Company, not the defendant

Tractor Company, at the time of the accident. Id. The Alabama Supreme Court noted that although the three men were in the general employment of the Tractor Company, "it is the reserved right of control rather than its actual exercise that furnishes the true test of relationship. He is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate result and in all its details." Id. (citations omitted). The Alabama Supreme Court stated that "'[a]n employee may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred . . . to the service of a third person, so that the employee becomes the servant of such third person with all the legal consequences of the new relation.'" Id. at 211 (quoting Alabama Power Co. v. Smith, 142 So. 2d 228, 239 (Ala. 1962)).

Furthermore, although the employees in Hendrix were paid by their general employer (the Tractor Company), the Alabama Supreme Court determined that their payroll status did not prevent them from being loaned servants of the Gas Company for the particular task at issue. Id. at 210. The Alabama Supreme Court concluded that while the borrowed servant doctrine is ordinarily a question of fact for the jury, the only inference that could be drawn was that the three employees were loaned servants of the Gas Company, which assumed all legal consequences of this relationship. Id. at 211. Accordingly, the Alabama Supreme Court in

31

Hendrix reversed the judgment and concluded that the Tractor Company was not liable for the accident. Id.

In Coleman v. Steel City Crane Rentals, Inc., 475 So. 2d 498 (Ala. 1985), the Alabama Supreme Court considered whether the jury properly found that defendant Steel City Crane Rentals, Inc. ("Steel City") was not liable under the borrowed servant doctrine for plaintiff's injuries caused by its crane even though Steel City owned the crane at issue and was the general employer of the negligent crane crew employees. Id. at 499-500. Plaintiff Evan Coleman was an employee of ICG and was removing wreckage from a train derailment. Id. at 499. ICG had leased the crane and was paying Steel City for the services of its crane crew. Id. at 500. The crane broke off a tree limb, which fell and injured Coleman. Id. at 499.

Although Steel City determined which employees to send on a particular crane assignment and retained the ultimate power to terminate employees, ICG could dismiss the entire crane crew. Id. at 500. Although the crane crew maintained discretion in positioning the crane, ICG specified how the rail line was to be cleared and when the crane crew could leave and signaled when the crane crew should lift a rail car. Id. The jury returned a verdict against ICG but in favor of Steel City, so the jury necessarily found that the crane crew employed by Steel City had become the "loaned servants" of ICG, making ICG alone liable for their

32

negligence.  Id.

Based on these facts in Coleman, the Alabama Supreme Court concluded that there was sufficient evidence for a jury to find that the crane crew had become borrowed servants of ICG, thus absolving Steel City of liability.  Id. at 501.  The Alabama Supreme Court noted that the "ultimate test" in determining whether an employee has become a loaned servant is which employer maintained the "reserved right to control the employee" and that "mere suggestions as to details necessary for a cooperative effort must be distinguished from actual authoritative direction and control."  Id. at 500.  In affirming the verdict in favor of Steel City, the Alabama Supreme Court concluded that "[a]lthough the question is a close one, there is sufficient evidence from which the jury could have concluded that ICG employees went beyond suggestions for a cooperative effort and exercised supervisory control over the actions of the Steel City Crane crew."  Id. at 501.

In United States Fidelity & Guaranty Co. v. Russo Corp., the Alabama Supreme Court again applied the borrowed servant doctrine in a crane case.  The plaintiff construction company owned a crane and sued Russo Corporation ("Russo") after Russo employee Ronald McClelland negligently operated the plaintiff's crane and damaged the plaintiff's property.  Russo Corp., 628 So. 2d at 487.  Russo employed McClelland to operate the crane and was a subcontractor on

33

the plaintiff's construction project.  Id.  Although all other Russo employees left the construction site after Russo's subcontractor work was complete, the plaintiff asked McClelland to remain to operate the crane, and Russo consented.  Id. McClelland delivered his time sheets to Russo and was paid by Russo, which was then reimbursed by the plaintiff.  Id. at 488.  Russo retained the right to move McClelland to another job site or terminate him, and it provided him with workers' compensation insurance and health insurance coverage.  Id.  However, McClelland reported directly to the plaintiff, which directed his daily work activities.  Id.

After McClelland negligently operated the crane and the plaintiff filed a negligence claim against Russo, Russo moved for summary judgment, contending that McClelland was the plaintiff's borrowed servant at the time of the accident. Id. at 487.  The trial court granted summary judgment to Russo.  Id.

Affirming the grant of summary judgment to Russo, the Alabama Supreme Court recognized that "one [McClelland] in the general employ of one master [Russo] may with respect to particular work be transferred to the service of a third person [plaintiff] in such a way that he becomes for the time being the servant of that person, with all the legal consequences of that relationship."  Id. at 488 (emphasis added).  Relying on Hendrix, the Alabama Supreme Court reasoned that because the plaintiff directed McClelland to operate the crane, the plaintiff

34

assumed complete control of him, notwithstanding the fact that Russo paid

McClelland's salary and insurance benefits.  Id. at 489.  Accordingly, the Alabama

Supreme Court concluded that the plaintiff, and not Russo, was liable for any

negligence attributable to McClelland.  Id.[12]

Given these Alabama cases, Fluor's potential status as a borrowed servant of

Solutia is critical because Alabama law recognizes the borrowed servant doctrine

as a complete defense to liability.  Moreover, Fluor proffered sufficient evidence to

raise a jury question about whether Lawrence was in fact a borrowed servant of

Solutia.

As noted earlier, Fluor proffered forty-one pages of deposition testimony

from seven witnesses relating to Solutia's care, control, custody, and supervision

of Lawrence.  Lawrence and several Solutia employees testified that Lawrence

worked permanently under the supervision of Solutia and received training, tools,

equipment, and his daily work assignments directly from Solutia.  Although

Lawrence submitted his timesheets to a Fluor employee, received his paychecks

from Fluor, and could be fired only by Fluor, Lawrence could still be a borrowed

servant of Solutia if Solutia reserved the right to control Lawrence's work and

---

[12]The borrowed-servant cases of Hendrix, Coleman, and Russo do not mention the AWCA or rely on the AWCA's statutory exclusivity bar.  Instead, these cases involved master-servant agency principles under Alabama common law.

controlled Lawrence's work at the time of the accident.  See Russo Corp., 628 So.

2d at 488-89; Coleman, 475 So. 2d at 500-01; Hendrix, 213 So. 2d at 210.

Accordingly, the erroneous exclusion of Fluor's evidence about Solutia's care,

control, custody, and supervision of Lawrence affected Fluor's substantial rights

by denying it the opportunity to rebut Proctor's respondeat superior claim.

We recognize that Proctor emphasizes that Fluor's contract with Solutia

stated that Fluor was an independent contractor that "maintain[ed] complete

control" of its employees.  Notwithstanding this contract, the jury reasonably could

find after considering the actual facts of Lawrence's employment that Lawrence

temporarily had an implied contract with Solutia by virtue of Solutia's supervision

and direction of his daily work assignments and that Solutia thus reserved the

ultimate right of control over Lawrence.  See Gaut v. Medrano, 630 So. 2d 362,

364, 368 (Ala. 1993) (noting that an employee loaned to a third-party employer

may enter an implied contract of hire with that employer and remanding for a jury

determination of the employee's status).[13]

_____

[13]In Gaut, the Alabama Supreme Court reversed a grant of summary judgment to defendant Holnam, Inc. ("Holnam") based on the trial court's finding that plaintiff Richard Gaut, an employee of Industrial Services of Mobile, Inc. ("Industrial"), had become a "special employee" loaned to Holnam and was thereby barred from bringing a tort claim against Holnam under the AWCA's exclusivity provisions.  630 So. 2d at 362, 368.  Industrial contracted with Holnam to provide employees at Holnam's plant and was designated as a "contractor" throughout the agreement.  Id. at 363.  Industrial hired Gaut, paid his wages, furnished tools and equipment bearing Industrial's name, coordinated his work schedule, and provided supervisors at Holnam's plant, and Holnam did not reserve a right to terminate Industrial employees based in

The Alabama Supreme Court has repeatedly held that vicarious liability stemming from master-servant relationships is usually a question of fact for the jury. See Ware v. Timmons, 954 So. 2d 545, 553-54 (Ala. 2006); Coleman, 475 So. 2d at 501 ("If reasonable persons can reach different conclusions on the question of whether a servant of one employe[r] has temporarily become the servant of another, it is a question of fact for the jury.").

After reviewing the evidence proffered by Fluor, we cannot say as a matter of law whether Lawrence was a Fluor employee or Solutia's borrowed servant at the time of the accident. Because Fluor's evidence could potentially convince a reasonable jury that Lawrence was Solutia's borrowed servant, and such a finding would serve as a complete defense to liability, the district court's erroneous exclusion of evidence regarding Solutia's care, control, custody, and supervision of Lawrence likely had a substantial impact on the jury's verdict. Accordingly, Fluor is entitled to a new trial.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Fluor's

---

Holnam's plant. Id. Despite this evidence, the Alabama Supreme Court concluded that it was a factual question for the jury whether Gaut had an implied contract with Holnam and had become a "special employee" of Holnam, triggering the AWCA's exclusivity bar, or remained solely an Industrial employee and able to sue Holnam. Id. at 367-68.

motion for judgment as a matter of law, but we reverse the district court's denial of Fluor's motion for a new trial, vacate the final judgment in favor of Proctor, and remand this case to the district court for a new trial consistent with this opinion.

**AFFIRMED IN PART**, **REVERSED IN PART, VACATED, AND REMANDED.**