[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 21, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11260
Non-Argument Calendar

_____

D. C. Docket No. 06-00086-CR-CG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TOMMIE NATHANIEL WHITE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(March 21, 2008)**

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Tommie Nathaniel White appeals his convictions for conspiracy to possess

with intent to distribute cocaine and crack cocaine, and possession with intent to distribute cocaine.  He also appeals his 400-month sentence as to each of those convictions.  White argues that the district court erred in limiting the scope of his cross-examination of certain witnesses and in permitting questions by the government bolstering the credibility of those witnesses.  He asserts that this deprived him of a fair trial in violation of the Sixth Amendment.  He also contests his sentence, arguing that (1) the court erred in applying the 100-to-1 crack-to-powder cocaine disparity in calculating his sentence; (2) the court misapplied a three-level manager-supervisor enhancement; and (3) his 400-month below-Guidelines sentence was unreasonble.  We AFFIRM.

## I. BACKGROUND

White was indicted on four counts: (1) conspiring to knowingly possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 1); (2) knowingly possessing with intent to distribute approximately 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (Count 2); (3) knowingly possessing with intent to distribute approximately 4.5 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count 3); and (4) knowingly possessing with intent to distribute approximately two ounces of cocaine, in violation of 21 U.S.C. §

2

841(a)(1), (b)(1)(C) (Count 4).[1]  White pleaded not guilty and the government filed an information indicating that White had been previously convicted of another drug offense and was therefore subject to enhanced penalties at sentencing.

Before trial, the government filed a motion in limine, informing the court that one of its witnesses, Felton Denham, had taken a polygraph exam and had been found to be deceptive about a single statement made in connection with "another subject, unrelated to his anticipated testimony against" White.  Doc. 24 at 1.  The government requested that White be prohibited from referring to the polygraph exam at trial.  Id.  White did not respond before trial.

During its opening statement at trial, the government noted that several witnesses had entered into "agreement[s] to cooperate and to provide information to the government."  Doc. 69 at 4.  The government later stated that "just because they've entered into an agreement with the government does not immediately discount their testimony," but made no reference to the standard truth-telling provisions in the plea agreements.  Id. at 6.  White made no objection during the government's opening statement.  During White's opening statement, he stated that the government's only evidence would stem from drug dealers "who are wanting to get out of jail or wanting to cut their sentence.  And they know what they have to

_____

[1] The indictment also contained a forfeiture provision, which is not at issue in the present appeal.

3

do to do it." Id. at 8. White's counsel conceded that White had been in trouble before, but stated "[t]hat was then. This is now. But I will submit to you that that's what makes him an easy target for these people. They had to come up with somebody, and here he sits." Id. at 8-9.

The government called ten witnesses: one law enforcement agent and nine witnesses who had been convicted and were cooperating with the government. The agent, Tommy Loftis, testified that he helped execute controlled purchases of cocaine and crack cocaine from Denham. In the process of examining Denham's phone records from a period of several months, Loftis had discovered that White had called Denham 260 times and Denham had called White 658 times. Doc. 47 at 25-26, 30.

After Loftis finished testifying, the government sought leave to introduce into evidence the cooperating witnesses' plea agreements. White objected to admitting the factual resume portions of the agreements, but not the plea agreements themselves. White described the factual resumes as "hearsay statements saying this is what happened, when in fact it is not an issue in this case." Id. at 51.

Clarence Reed then testified that he had purchased crack cocaine from White on numerous occasions in 2003. He also testified that Denham had purchased

4

drugs from White. Reed described a trip to Atlanta he had made in 2003 with White and a female courier, during which they had purchased $10,000 worth of drugs from two females and had then duct taped the drugs to the female courier for transport back to Alabama. During cross-examination, defense counsel asked Reed whether he had promised to be completely truthful in his plea agreement and, after Reed acknowledged that he had, asked Reed why he had not mentioned White's drug dealing during his initial debriefing interview with law enforcement.

Before Denham testified, the district court granted the government's motion in limine, ruling that "the probative value [of evidence related to the polygraph exam] is way overweighed by confusion on the issue of everything else." Id. at 87-88. Defense counsel agreed not to raise the polygraph exam directly, but asked for permission to ask Denham whether he had violated the terms of his plea agreement. The district court explained that this would indirectly raise the polygraph results and ruled against White, stating "I don't think that's admissible simply because the government doesn't have an opportunity to go back and explain what that is and it's left for the jury to speculate. And so I don't think . . . you need to go into that." Id. at 88. White did not raise a Confrontation Clause objection at that time.

During direct examination of Denham, the government questioned him

5

about his plea agreement and the following dialogue occurred:

> [Government]: And does this plea agreement provide you with the opportunity to cooperate with the government?
>
> [Denham]: Yes, ma'am.
>
> [Government]: And what are you supposed to do in cooperating with the government?
>
> [Denham]: Tell the truth and tell the role that I played, that I took place in.
>
> [Government]: And have you provided the government with information about your role in this case?
>
> [Denham]: Yes, ma'am.

Id. at 88-90. White raised no objection and Denham proceeded to discuss his drug dealings with White and others. The government later asked whether Denham's plea agreement required that he tell the truth and Denham acknowledged that it did. White did not object. Denham testified that he had purchased drugs regularly from White beginning in 2003. After White returned from drug buying trips to Atlanta – once with Reed and once with an unidentified woman – the drugs were divided at the home of O.G., one of White's associates. White had also taught Denham how to convert cocaine into crack cocaine.

During cross-examination, Denham confirmed that, after he was arrested, he had promised to cooperate fully with the investigation and to tell "the whole truth."

6

Id. at 121.  The following dialogue then occurred:

[White's counsel]: You lied, didn't you?

[Denham]: No, sir.

[White's counsel]: Okay.  You told Mr. Loftis the whole truth; is that right?

[Denham]: Yes, sir.

[White's counsel]: Beginning in December of 2004?

[Denham]: Yes, sir.

Id.  Denham then testified that, although the summation of his interview with Agent Loftis did not mention White, he and White had been involved with drug dealing.

When White attempted to inquire about the factual resume in Denham's plea agreement, the government objected on hearsay grounds.  White responded that the resume could be used to demonstrate a prior inconsistent statement because Denham had testified to engaging in illicit activity with White, but the resume did not mention White.  The district court ruled that White could not continue asking such questions because the resume contained only an acknowledgment by Denham that the government could prove the facts contained within.  The following dialogue then occurred:

[White's counsel]:  I want to ask him: "Did you sign this? Was there

7

some other information you wanted to put in here or not want to put in here? Was this what you pled guilty to?"

[The Court]: No. This does not purport to be a statement of his nor is this what he pled guilty to. This is what the government said they could prove to support his conviction and doesn't purport to be everything they could prove. So using it for that purpose I think is improper. . . .

. . . You can certainly establish that he hasn't made any statement about Mr. White before he entered his guilty plea, if that in fact is true.

Id. at 132-33. White did not raise a Confrontation Clause objection. White subsequently asked Denham whether Denham had mentioned his dealings with White at the time he pleaded guilty and he responded that he had not. Denham indicated that he had first mentioned White to police approximately 13 months after his guilty plea.

Charles Thomas testified next that he had purchased cocaine and crack cocaine from White. According to Thomas, O.G. served as a "runner" and did drug business errands for White. Id. at 147-48. Thomas was not asked whether he had promised to testify truthfully pursuant to his plea agreement or whether he had fully complied with the agreement's terms.

Alfred James testified to purchasing marijuana, cocaine, and crack cocaine from White until late 2005. According to James, O.G. ran errands for White.

8

James also stated that White had spoken to Denham "about getting his money right so he could . . . make the trip" to Atlanta. Id. at 175. During cross-examination, James testified that he had not discussed his dealings with White until his second meeting with Agent Loftis. Jones was not asked whether he had promised to testify truthfully pursuant to his plea agreement, although he was asked on redirect whether the plea agreement contained his only agreement with the government.

Roderick Gulley, a cousin of White's, testified that he purchased cocaine from White several times in 2005. During cross-examination, Gulley testified that he had first told police about White less than a month earlier.

Seymour Irby testified that he had helped Denham distribute cocaine and crack cocaine. Irby observed Denham purchase 500 grams of cocaine from White inside Denham's trailer. An associate of White's, "[a] tall guy named Ali," was also present. Doc. 48 at 229. On redirect, Irby stated that his plea agreement provided for punishments in the event that he testified untruthfully.

Douglas Hill testified that he had sold marijuana, codeine, promethazine, and cough syrup to White via a third party. He had purchased cocaine, crack cocaine, and marijuana directly from White and had acquired approximately one kilogram of crack cocaine in total. Id. at 257.

Terrance Dortch testified that he had purchased drugs from White and that

9

White once showed him how to cook crack cocaine. During cross-examination, White's counsel asked whether Dortch had signed a factual resume as part of his plea agreement. The district court sustained the government's objection to this line of questioning.

Phamous Hobbs testified that he had purchased cocaine and crack cocaine from White on numerous occasions and at several locations, including at the home of a cousin of Hobbs. White would give the cousin "a little something for calling" him about Hobbs's interest in purchasing drugs. Id. at 307. Dortch also purchased drugs from White at the home of Hobbs's cousin. During cross-examination, White asked Hobbs whether he had signed a factual resume as part of his plea agreement and Hobbs answered affirmatively.

After the government rested, despite his previous objection to their admission, White attempted to introduce into evidence the factual resumes of Denham, Dortch, and Hobbs. The court denied the request, explaining that it still ruled that "those [we]re not statements, they [we]re simply factual resumes prepared by the government that the defendants agreed the government could prove in relation to their particular case at the time they were pleading guilty." Id. at 327. White did not raise a Confrontation Clause objection. White called several witnesses during his case-in-chief, but declined to testify on his own behalf. The

10

government called Agent Loftis in rebuttal.

During its closing argument, the government noted that the evidence supporting Count 2 had been established by Irby. The government also stated that the plea agreements had been put into evidence and the jury would be able to review them and "see all of the conditions and the consequences that result from those plea agreements." Doc. 70 at 12. The government observed that the plea agreements "create[d] the need for those witnesses, the absolute necessity for them to be truthful . . . ." Id. at 13. White's counsel did not object. During White's closing, defense counsel stated that "[y]ou couldn't believe these people" and that "if it's come the time in our society when we bring this type of evidence in here and we come in here and stand in front of our citizens and say convict this person of this evidence, you might as well burn the courthouse down because there's no justice anymore . . . ." Id. at 32, 33. In rebuttal, the government stated that Agent Loftis had years of experience and was "not going to be just suckered." Id. at 38. The government also explained that Agent Loftis was testifying in the case because "[h]e believe[d] in this case." Id. at 40. White's counsel did not object.

While waiting for the jury to reach a verdict, White's counsel stated, "Judge, we enjoyed trying the case with you. It was a fair trial and we enjoyed trying it." Doc. 48 at 412. White was ultimately convicted on Counts 1 and 2, and acquitted

11

of Counts 3 and 4.

Before sentencing, a probation officer prepared a presentence investigation report ("PSI"), setting White's base offense level at 38 because his offense involved more than 1.5 kilograms of cocaine base. See U.S.S.G. § 2D1.1(c)(1) (2005). Because a dangerous weapon was involved, two levels were added under § 2D1.1(b)(1). Three levels were then added on the ground that White was a manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive. See § 3B1.1(b). White, a career offender, was also placed in criminal history category VI based on his criminal history points. With an adjusted offense level of 43, and a criminal history category of VI, White's resulting Guidelines range was life imprisonment.

Prior to sentencing, White raised several objections to the PSI, only one of which is relevant to the present appeal – that application of the 100-to-1 crack-to-powder cocaine sentencing disparity is irrational. The district judge addressed this objection at sentencing by way of the following interchange:

[The Court]: What I would like to do, Mr. Madden, is first calculate the guideline –

[White's Counsel]: Yes

[The Court]: – and get your objections to that.

[White's Counsel]: Yes, that's fine.

12

[The Court]:      Okay.  And then we'll deal with any other arguments you have about what is a reasonable sentence in this case.

[White's Counsel]: Yes

[The Court]:       So insofar as your 100-to-1 ratio is an objection to the way the guidelines are calculated, I overrule that objection based upon the current state of the law.

Doc. 71 at 3.

At sentencing, White also objected to the managerial role enhancement imposed pursuant to § 3B1.1(b).  White argued that the government had mischaracterized buyer-seller relationships as conspiratorial relationships, and that White had not supervised five individuals. The district court found that the adjustment was proper because even if Denham's drug-dealing organization were excluded from the calculation, at least five individuals  –  including White, Reed, Denham, O.G. and the female courier  –  were involved in one of the trips to Atlanta "and that the activity was otherwise extensive." Doc. 71 at 10-11.  After discussing and ruling on these, and the government's objections, the district court implicitly adopted the Guidelines calculations made by the probation office. Throughout his calculations of the Guidelines range, the district court reminded counsel that the guideline calculation "doesn't say anything about the

13

reasonableness of it." Doc. 71 at 6.

After calculating the Guidelines range, the district court asked White's counsel to present his argument as to "what [would be] a reasonble sentence." Id. at 15. White's counsel argued that the sentence was skewed based on the 100-to-1 crack-to-powder cocaine sentencing disparity, asserting that imposing a life sentence on these facts was "crazy" and "the essence of unreasonableness." Id. at 16. He requested a sentence of 20 years, the statutory minimum.

After White's sister spoke on his behalf, White protested his innocence stating that he "just couldn't plea out to something [he] didn't do" and that he had not even recognized four of the witnesses. Id. at 18-19. Pointing out that White had demonstrated no remorse for his actions, the government requested the imposition of a life sentence and noted that if White were to serve one year "for every life that he wrecked by peddling crack cocaine in this town, 30 years [would not be] enough." Id. at 21.

Having listened to the arguments of both parties and stating that it had considered the statutory purposes of sentencing and the Guidelines, the district court found "that in this case the guidelines are too high." Id. at 22. The district court instead sentenced White to 400 months on each count of conviction, to be served concurrently. The court explained that although it did not "believe a life

sentence to be appropriate," a 400-month sentence as to each count was reasonable and was what was required "to reflect the seriousness of the offense and to promote respect for the law and to provide a just punishment and to afford adequate deterrence to criminal conduct . . . especially to protect the public from further crimes since [White's] first round in the federal penitentiary [had] not seem[ed] to slow [him] down." Id. at 22-23. The court particularly called attention to the fact that White "[had]n't miss[ed] a beat when [he] came out of prison going right back into dealing." Id. at 22. White was also sentenced to ten years of supervised release on Count 1 and eight years on Count 2, to be served concurrently, and was ordered to pay a $200 special assessment. White raised no new objections. He has timely appealed both his conviction and his sentence.

On appeal he argues that the cumulative effect of the following evidentiary errors deprived him of the constitutional right to a fair trial: (1) the district judge's preventing him from questioning Denham about whether he had violated the terms of his plea agreement; (2) the district judge's preventing him from questioning Denham, Dortch, and Hobbs about the factual resumes underlying their plea agreements; and (3) the government's bolstering of witnesses during its opening statement and closing argument, and questioning them about whether their plea agreements required them to testify truthfully. He also protests his sentence on the

15

grounds that (a) the district court improperly applied the three-level manager supervisor enhancement pursuant to U.S.S.G § 3B1.1(b); (b) the district court erred by applying the 100-to-1 crack-to-powder cocaine sentencing disparity; and (c) a 400-month sentence is unreasonable in his case.

## II. DISCUSSION

A. Trial/Conviction

### 1. Scope of Cross-Examination - Denham

White first argues that being prevented from questioning Denham about whether he believed he had violated his plea agreement (by lying during a polygraph examination) prevented the jury from understanding that the plea agreement's requirement of truthfulness was not a guarantee.[2] A "district court has discretionary authority to limit cross-examination," but "must permit sufficient cross-examination to satisfy the [C]onfrontation [C]lause of the sixth amendment." United States v. Burke, 738 F.2d 1225, 1227 (11th Cir. 1984). The [C]onfrontation [C]lause "is satisfied where sufficient information is elicited from the witness

---

[2]White has not challenged the evidentiary ruling, apparently conceding that the district court did not abuse its discretion by excluding evidence of the polygraph exam specifically. See United States v. Piccinonna, 885 F.2d 1529, 1536 (11th Cir. 1989) (en banc) (clarifying that polygraph evidence is inadmissible in our circuit absent a stipulation by both parties as to the circumstances of the test and the scope of admissibility, unless it is used to impeach or corroborate testimony at trial, and then there must have been adequate notice provided to the opposing party of the intended use). Neither party argues that any of the prerequisites for admission of polygraph evidence are met in this case.

16

[such that] the jury can adequately gauge the witnesses' credibility." Id. Where the defendant fails to "lodge a timely Confrontation Clause objection" before the district court, review is for plain error. United States v. Arbolaez, 450 F.3d 1283, 1291 (11th Cir. 2006) (per curiam). An appellate court may, in its discretion, correct plain error where there is "(1) error, (2) that is plain, and (3) that affects substantial rights . . . but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

White raises his Confrontation Clause challenge for the first time on appeal, and so our review is for plain error. See id. At trial, White's counsel was able to ask Denham several times whether Denham had told the investigating agent the whole truth, to which Denham responded that he had. Although White argues that a concession by Denham that he believed he had violated his plea agreement would have pointed out to the jury that closer scrutiny of his credibility was required (since the violation might have caused him to want to curry favor with the government by lying about White), Denham's response that he had told the whole truth to the investigating officer demonstrates that he would not have made any such concession. As White concedes, because Denham denied ever having lied, the district court's ruling on the motion in limine – which has not been challenged – foreclosed any further inquiry into the matter. See Reply Br. at 3-4. White's

17

attorney was able to elicit the same information by way of alternative questioning.

Further, the jury was exposed to facts sufficient to evaluate Denham's credibility,

specifically that he was a drug dealer and that he had not mentioned White's name

to the government until 13 months after his guilty plea. Thus, the Confrontation

Clause was satisfied and there was no error.[3] See Burke, 738 F.2d at 1227.

*2. Factual Resumes*

Despite having objected to their admission at an earlier point in the trial,

White next argues that the factual resumes (i.e., the sections of the witnesses' plea

agreements describing the facts provable by the government that would support

their convictions) should have been admitted because they were incorporated into

the plea agreements, were admissible under Federal Rule of Evidence 106, were

relevant to credibility, and were not hearsay. "We review evidentiary rulings for

an abuse of discretion." United States v. Henderson, 409 F.3d 1293, 1297 (11th

---

[3]It is not clear whether White also argues that the exclusion of Denham's testimony as to whether he had breached his plea agreement constitutes reversible error apart from any Confrontation Clause issue. To the extent that he does so argue, however, we find no error. To preserve an objection to the district court's exclusion of evidence, the "substance of the evidence [must be] made known to the court by offer or [be] apparent from the context in which questions were asked." Proctor v. Fluor Enters., Inc., 494 F.3d 1337, 1350 (11th Cir. 2007). We then review an exclusion of evidence for abuse of discretion. Id. at 1349. If there was an abuse of discretion, we reverse only if the exclusion of evidence affected a substantial right. Id.

Because White's attorney explained to the judge exactly what evidence he wanted to introduce and why, the objection is preserved. However, as the judge explained, allowing a question as to the status of Denham's plea agreement would have required indirect reference to the properly excluded polygraph evidence. Accordingly, particularly in light of the fact that White's attorney was still able to elicit a response to a similar question, we find no abuse of discretion in the exclusion. Thus, we find no error.

18

Cir. 2005), <u>cert. denied</u>, 126 S.Ct. 1331 (2006). "An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." <u>United States v. Hands</u>, 184 F.3d 1322, 1329 (11th Cir. 1999). An error is harmless if it did not have a substantial influence on the outcome and the evidence without the error is sufficient to support the conviction. <u>Id.</u>

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Although the balance should always be "struck in favor of admissibility," <u>United States v. Edouard</u>, 485 F.3d 1324, 1344 n.8 (11th Cir. 2007) (citation omitted), relevant evidence may be excluded if its probative value is substantially outweighed by certain factors such as the dangers of "unfair prejudice, confusion of the issues," or potential to mislead the jury, or, "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; <u>see also</u> <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 1732 (2006).

White's only purpose in introducing the factual resumes was to demonstrate that the witnesses had not immediately informed the government of their connections to White and, therefore, that their testimony as to White lacked

credibility. Even without the resumes, during his cross-examination of these witnesses, White's defense counsel was permitted to ask whether and why they had each delayed in informing the government about their dealings with White. None of them denied having done so. Therefore, the resumes constituted cumulative evidence and need not have been admitted. See Fed.R.Evid. 403. There was no error.

### 3. Truth-telling Provisions - Bolstering

White also argues that the district court erred in allowing the government to introduce and discuss the truth-telling provisions of its witnesses' plea agreements. Although we have held that "the mere admission in evidence of a plea agreement does not constitute bolstering by a prosecutor . . . the clauses of the plea agreement in which the witness promised to testify truthfully should be redacted before the document is admitted in evidence unless the admission of the plea agreement is not questioned." United States v. Hilton, 772 F.2d 783, 787 (11th Cir. 1985). If a witness's credibility is attacked during cross-examination then the government may show the witness's promise to testify truthfully. Id.

Because White made no objection to the admission of the plea agreements, any contention that the truth-telling portions of the agreements should have been redacted is meritless. See id.; Doc. 47 at 51. White also objects to the

20

government's emphasis on the truth-telling portions of those agreements in questioning its witnesses. Because White attacked the credibility of the witnesses during his opening statement, the district court did not err in allowing the government to introduce the language on direct examination of its witnesses.[4] See Hilton, 772 F.2d at 787; see also United States v. Delgado, 56 F.3d 1357, 1368 (11th Cir. 1995) ("[I]f defense counsel attacks a witness's credibility during opening the prosecutor may rehabilitate the witness on direct examination. Specifically, a prosecutor may 'elicit testimony regarding the truth-telling portion of a cooperation agreement during direct examination.'") (citation omitted).

*4. Prosecutorial Misconduct-Vouching*

Finally, with respect to his convictions, White argues that the district court allowed the government improperly to vouch for the credibility of agent Loftis during its closing argument. "Absent a contemporaneous objection, the propriety of the Government's closing argument and alleged prosecutorial misconduct in improperly vouching for a witness' credibility are reviewed under a plain error standard." United States v. Newton, 44 F.3d 913, 920 (11th Cir. 1994). We reverse a defendant's conviction on the basis of prosecutorial misconduct only where the prosecutor's remarks "(1) were improper and (2) prejudiced the

---

[4]The record shows that the government did not mention the truth-telling provisions in the course of its opening statement.

21

defendant's substantive rights." United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998); see also United States v. Abraham, 386 F.3d 1033, 1036 (11th Cir. 2004) (per curiam) (explaining that prosecutorial misconduct justifies a reversal of a defendant's conviction only where the defendant's substantial rights may have been prejudiced "in the context of the entire trial in light of any curative instruction"). "When reviewing a defendant's 'vouching' claim, we examine whether (1) the prosecutor placed the prestige of the government behind the witness by making explicit personal assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony." United States v. Arias-Izquierdo, 449 F.3d 1168, 1177-78 (11th Cir. 2006). "The prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991).

"In order to assess the prejudicial impact of a prosecutor's statements, we must evaluate them in the context of the trial as a whole and assess their probable impact on the jury." Hernandez, 145 F.3d at 1438. To meet the substantial prejudice prong, the improper comments must have "so infect[ed] the trial with

22

unfairness as to rise to the level of a denial of due process." United States v. Eyster, 948 F.2d 1196, 1207 (11th Cir. 1991).

As discussed, White was able to counter any argument the government may have made that the plea agreements guaranteed the truthfulness of the nine cooperating witnesses by pointing out their criminal histories and the delay of each in informing the government of their connections to White. Although, in her closing argument, the prosecutor did argue that Loftis was credible (after the credibility of all government witnesses had been made the focus of the defendant's closing argument), she did not suggest that the jury ought to find him credible because he was a government agent or because the government found him credible. Instead, the prosecutor reminded the jury of Loftis's lengthy experience as an agent and of the details of his investigation of the case, referring only to evidence already admitted at trial. Even if the government had improperly vouched for Loftis's credibility, the testimony of the nine other government witnesses and the cell phone log evidence connecting Denham with White was sufficient that, even if there were an error, it did not affect White's substantial rights and did not so infect the trial with unfairness as to make the resulting convictions a denial of due process. See Arbolaez, 450 F.3d at 1291; Eyster, 948 F.2d at 1207. Accordingly, we discern no reversible error.

*5. Cumulative Effect*

"It is true that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial might be necessary." United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993). "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997). However, where there is no error or only a single error, "there can be no cumulative error." See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (per curiam) (citation omitted).

As discussed, we have found no individual errors, harmless or otherwise. Further, even if the government's vouching for Loftis's credibility had constituted harmless error, it would only be a single error and thus could not constituted cumulative error. Id.

B. Sentencing

After Booker, we review sentences for reasonableness. United States v. Booker, 543 U.S. 220, 261, 125 S. Ct. 738, 765 (2005). "[A] sentence may be reviewed for procedural or substantive unreasonableness." United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006). A sentence is procedurally

24

unreasonable if it stems from a procedure that failed to follow the requirements of

Booker – e.g., if the district court does not consider the 18 U.S.C. § 3553(a)

factors or relies on an impermissible factor. Id. at 1182. A sentence may be

substantively unreasonable even if it is procedurally reasonable. Id. at 1182 n.3.

Finally, when reviewing a sentence imposed by the district court, we must first

ensure that the district court correctly calculated the guideline range. United States

v. Winingear, 422 F.3d 1241, 1245 (11th Cir. 2005) (per curiam).

*1. Guidelines Calculation - Base Offense Level*

White first challenges the district court's calculation of his Guidelines range.

The district court imposed a base offense level of 38 based upon its finding that

White had been involved with more than 1.5 kilograms of crack cocaine.[5] White

argues that the guideline in question, U.S.S.G. §2D1.1(c)(1) (2005) was

"unjustifiably harsh." Appellant's Br. at 22. Essentially, White's argument does not

concern the calculation, but the content of the guideline at issue at the time of his

sentencing.[6] Because the district court is bound first correctly to calculate the

---

[5]On appeal, White does not challenge this finding of fact regarding quantity.

[6]In November 2007, the Sentencing Commission amended § 2D1.1(c)(1). Under the amended guideline, an offense such as White's, involving 1.5 or more kilograms of crack-cocaine would have generated a base offense level of 36 rather than 38. See § 2D1.1(c)(1) (2007). On 11 December 2007, the Sentencing Commission made this amended guideline retroactive as of 3 March 2008. Sentencing Commission News Release, http://www.ussc.gov/PRESS/rel121107.htm (last visited Feb. 19, 2008). Accordingly, White may file a motion with the district court requesting a reduction in his sentence, if appropriate, pursuant to 18 U.S.C. § 3582(c)(2).

Guidelines range, and because the court found that White's offense had involved 1.5 kilograms or more of crack cocaine, the court's imposition of a base offense level of 38 at the time of White's sentencing in March 2007 was without error. See Winingear, 422 F.3d at 1245.

*2. Guidelines Calculation - Managerial Role Enhancement*

White next argues that the district court improperly applied a three-level increase to his base offense level, pursuant to U.S.S.G. § 3B1.1(b), based upon its finding that White was a manager or supervisor. The district court's determination of a defendant's role in an offense is reviewed for clear error and the application of the Guidelines is reviewed de novo. United States v. Njau, 386 F.3d 1039, 1041 (11th Cir. 2004) (per curiam). "The government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense." United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2003).

A three-level enhancement may be applied under U.S.S.G. § 3B1.1(b), "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . . ." "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1) (2005). In Njau, we held that the defendant in a social security

fraud scheme exercised supervisory authority over at least one person where, <u>inter</u> <u>alia</u>, he recruited two individuals to receive social security cards that were to be ultimately issued to illegal aliens. <u>Njau</u>, 386 F.3d at 1040-41. We determined that both of those individuals were participants. <u>Id.</u> at 1041. "In a drug distribution case . . . the management enhancement is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy." <u>United States v. Matthews</u>, 168 F.3d 1234, 1249 (11th Cir. 1999).

The factors that a court should consider in determining the nature of the defendant's role include:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4).

"In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment. (n.3). Criminal activity may be "otherwise extensive" only if at least one other participant is involved. <u>United States v. Walker</u>, 490 F.3d 1282, 1301 (11th Cir.

27

2007).

The evidence at trial showed that White exercised supervisory authority over at least two individuals: an errand runner whose home was used for drug distribution (O.G.), and the female courier to whom drugs were duct-taped to avoid detection. In addition to those two individuals and White, at least five other individuals were also involved in the offense: Denham, two of the other witnesses at trial, and the two females who sold the drugs to them in Atlanta. Furthermore, White arranged drug transactions, negotiated sales, and hired others to work for the conspiracy. See Matthews, 168 F.3d at 1249. Therefore, the district court did not err in concluding that White was a manager or supervisor and that the criminal activity involved five or more participants or was otherwise extensive. See U.S.S.G. § 3B1.1, comment. (n.1); Njau, 386 F.3d at 1041.

*3. Reasonableness of Sentence*

White also argues that the 100-to-1 crack-to-powder cocaine disparity in the Sentencing Guidelines made the 400-month sentence imposed upon him unreasonable. Since White's sentencing, the Supreme Court has issued its opinion in Kimbrough v. United States, __ U .S.__, 128 S. Ct. 558 (2007). At issue in Kimbrough was a district court decision to vary below the advisory Guidelines range based on a finding that the Guidelines provided a sentence greater than

28

necessary to accomplish the sentencing goals advanced in 18 U.S.C. § 3553(a). The Court held that "the cocaine Guidelines, like all other Guidelines, are advisory only," and that "[t]he judge may determine . . . in [a] particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing. In making that determination, the judge may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses." Id. at __, 128 S. Ct. at 564. The Supreme Court concluded that the district court had "appropriately framed its final determination in line with § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." Id. at __, 128 S. Ct. at 575.

Here, just as in Kimbrough, the district court sentenced White below the advisory guidelines range, on the ground that the advisory range was "too high" to accomplish the purposes of sentencing. Doc. 71 at 22. Accordingly, we find no error based on Kimbrough. The sentence is thus procedurally reasonable.

Because White has generally challenged the reasonableness of his sentence we also review the sentence in light of the 18 U.S.C. 3553(a) factors to determine whether the sentence fails to achieve the purposes of sentencing set forth in that statute. United States v. Martin, 455 F.3d 1227, 1237 (11th Cir. 2006). We review

only the final sentence for reasonableness, rather than each individual decision made during the sentencing process. Winingear, 422 F.3d at 1245.

"[T]the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions." Gall v. United States, __ U.S. __, __, 128 S. Ct. 586, 594 (2007); see also Kimbrough, __ U.S. at __, 128 S. Ct. at 576 (stating that appellate courts should give "due respect to [a] District Court's reasoned appraisal" of the proper sentence for a defendant). "[T]here is a range of reasonable sentences from which the district court may choose." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). Although, there are "sentences outside the range of reasonableness that do not achieve the purposes of sentencing stated in § 3553(a) and that thus the district court may not impose," Martin, 455 F.3d at 1237, "[a] district court may impose a sentence that is either more severe or lenient than the sentence [we] would have imposed." Talley, 431 F.3d at 788. Although "[w]e do not in this circuit presume reasonable a sentence within the properly calculated Guidelines range," the Supreme Court has upheld other circuits' decisions to do so. United States v. Campbell, 491 F.3d 1306, 1313 (11th Cir. 2007). Finally, "the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in light of both [the] record and the factors in section 3553(a)." Talley, 431 F.3d at 788.

Here, the district court complied with the requisite procedural requirements, viewing the applicable guideline range as advisory and explicitly considering the § 3553(a) factors. The court explained that a 400-month sentence as to each count was required to reflect the seriousness of the offenses, promote respect for the law, provide a just punishment, and to afford adequate deterrence to criminal conduct. We find that the sentence imposed was within the range of reasonable sentences that the district court could have imposed, especially considering that it was below the then-applicable Guidelines range under which White faced up to life imprisonment and still falls within the range that would have resulted under the amended guideline. See Campbell, 491 F.3d at 1313. Accordingly, we find that White has not offered any reason – other than his belief that the original guideline resulted in an unreasonable sentencing range – that his case merits a lesser sentence. He has not met his burden of establishing that his sentence was procedurally or substantively unreasonable.

### III. CONCLUSION

White appeals his conviction and sentences for two counts of cocaine-related offenses. We find no reversible error as to the district court's limits on cross-examination or its evidentiary rulings. Nor do we find any error, plain or otherwise, as to bolstering, vouching or other prosecutorial misconduct.

31

Accordingly, Whites convictions are **AFFIRMED.** Similarly, we find that White

has failed to demonstrate that his sentence was procedurally or substantively

unreasonable. Therefore, we **AFFIRM** his sentence as to each count.