[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 18, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15717
Non-Argument Calendar

_____

D. C. Docket No. 06-04800-CV-3-IPJ

GENERAL SOUTHERN INDUSTRIES, INC.,
WARRIOR RIVER STEEL, LLC,

Plaintiffs-Counter-Defendants-
Appellants,

versus

STANLEY SHUB,
SHUB MACHINERY,

Defendants-Counter-Claimants-
Appellees,

DANIEL GIST,

Defendant-Counter-Defendant-
Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(November 18, 2008)**

Before ANDERSON, CARNES and HULL, Circuit Judges.

PER CURIAM:

In this diversity jurisdiction case arising out of a dispute over a commission for a commercial lease transaction the defendants, General Southern Industries, Inc., Warrior River Steel, LLC, and Daniel Gist, appeal from the district court's judgment awarding $530,000.00 to the plaintiffs, Stanley Shub and Shub Machinery.

## I.

Stanley Shub is the president of Shub Machinery, an equipment broker that deals in heavy machinery. Through his work, Shub has developed a network of customers and has become familiar with machine shops and plants worldwide. In October 2003 William Greger, the real estate manager for United Defense, called Shub to see if he knew of anyone interested in selling a manufacturing facility with the lifting capabilities and water access required for United Defense to build gun magazines for warships for the United States Navy's DD(X) program. Shub told Greger he would check and get back to him. United was not publicly advertising that it was looking for a facility.

Based on the requirements that Greger had described, Shub thought of the Warrior River Steel facility in Cordova, Alabama. Shub knew that Daniel Gist, the

president of General Southern and managing member of Warrior River, owned the facility, so on October 20, 2003 Shub called Gist to see if he had any interest in selling it to Shub's customer. Gist told Shub he might be interested in talking to Shub's customer, but he was not actively trying to sell the facility.

After their conversation, Shub emailed Gist asking him to send information about the square footage, crane capacity, and machinery of the facility. Shub also stated: "Please would you also agree to pay us a 10% commission based on the selling price if we are successful in concluding this deal." Shub and Gist talked again on October 22, 2003, and when Shub learned that Gist had not received his October 20 email, Shub emailed Gist again. In the email, Shub again requested information about the facility and asked Gist to agree to a ten percent commission "based on the selling price" of the facility. Shub also wrote that he would send a draft fee agreement to Gist.

Later that evening Gist emailed Shub a description of the facility and its equipment. Gist did not mention anything about a commission. After he received the email, Shub spoke to Greger to tell Greger that he was aware of a potentially suitable facility for United Defense. Greger was interested in learning more about the facility, so Shub sent him an email with the specifications Gist had provided.

The next day, October 23, Shub faxed and emailed Gist a proposed fee agreement. The agreement provided that Shub would introduce Gist's company, General Southern Industries, Inc., to Shub's interested customer and that General Southern Industries would pay a ten percent commission to Shub if his interested customer purchased "some or all of the Property or stock of GSI." After Gist received the fee agreement on October 24, 2003, he emailed Shub with a counteroffer to Shub's proposed commission: a fixed fee of $250,000 if the interested customer bought the facility.

After Shub received the email he called Gist to discuss their potential deal. The terms that the parties discussed later became central to their dispute. Gist claimed that the men agreed that Gist would pay Shub a fixed fee of $500,000 if Shub's interested customer purchased the facility. Shub, however, understood their telephone agreement to be that he would be paid a commission if there was a "transaction." At the end of their conversation, Shub revealed to Gist that United Defense, through its representative Greger, was his interested customer.

Following their conversation, and still on October 24, Gist sent Shub an email confirming their agreement: "Stan this email confirms our agreement to pay you as commissions a fixed fee of $500,000 if we sell [the facility] to your interested buyer United Defense or it[s] affiliated companies or representatives."

4

Shub responded to Gist's email, thanking Gist for confirming the agreement. The men had no further discussions about the payment of a commission, but Shub did send Gist another email which again provided Greger's name and contact information to Gist.

Back at United Defense, Greger communicated the information Shub had given him about the facility to other employees involved in its site selection process. Before Shub had told Greger about the facility and introduced Greger to Gist, no one at United Defense knew of Gist or the facility. After introducing United Defense and Gist, Shub arranged for Greger and other United Defense representatives to tour the facility on December 12, 2003. On November 14 Shub sent Gist an email confirming the date for the tour, and on December 9 Shub sent Gist another email requesting directions to the facility. Gist provided Shub with the information on the same day.

On December 12, 2003 Shub drove several United Defense employees from Birmingham, Alabama to the facility in Cordova, Alabama for a tour. The group from United Defense included Greger, Joe Stutesman, the company's director of manufacturing, and John Kalpin, the company's deputy program manager. Shub had never met Greger in person or spoken to Stutesman or Kalpin before that day. Shub and the United Defense representatives met with Gist shortly before the tour

5

of the facility, which lasted about three hours. Greger and Kalpin told Gist that United Defense was still investigating property and hoped to occupy a facility in approximately two years. Gist, in turn, told Greger that he had pending projects at the facility that would take a year and a half to complete.

After the visit Shub did not have any further written communications with Greger or anyone else from United Defense about the facility. Greger and Gist however, continued their discussions, even though United Defense had not yet been awarded a manufacturing contract from the Navy. Greger inquired about the asking price of the facility, and Gist told him that it was $20 million. Greger thought the price was high and that United Defense could negotiate a better price. United Defense was also considering leasing the facility, and Greger discussed with Gist that option.

Representatives from United Defense again visited the facility in May 2004. As the site search continued, United Defense had periodic discussions with Gist and occasionally scheduled additional visits to the facility. The facility was one of United Defense's top choices, but in early 2005 the site selection process was temporarily put on hold because of a concern that the Navy might eliminate the DD(X) program. On June 24, 2005 BAE Systems, Inc. acquired United Defense.

BAE again began exploring possible sites for the program, and the facility remained an option.

As a matter of BAE's corporate policy, CRESA Partners, LLC, a real estate advisory firm used regularly by BAE, became involved in the site selection process. BAE initially decided to use a different site for their project, but in April 2006, the company learned that the site had zoning problems and decided to reopen its search. BAE gave CRESA the information about the facility that had been given to United Defense by Shub. A CRESA representative also called Greger, who no longer worked for BAE, for information about the facility.

In late April 2006 a representative of CRESA called Gist to see if he had any interest in leasing the facility to BAE. Gist was interested and entered into negotiations with CRESA to lease the facility to BAE. BAE signed a lease with Gist for the Warrior River facility on September 29, 2006. The agreement was for a term of ten years, and it required BAE to pay $1,500,000 per year in rent. Under the lease agreement Gist, as the owner of the facility, was required to pay for some renovations and improvements of the facility.

On October 16, 2006 Shub learned of the lease between BAE and Gist when Greger called to congratulate him. Shub called Gist, who denied that there was a lease. Shub then sent Gist an email requesting his $500,000 commission, but Gist

did not respond. Instead General Southern Industries and Warrior River filed suit in Alabama state court seeking a declaratory judgment that they did not owe Shub or Shub Machinery (collectively "Shub") the $500,000 commission. Shub removed the case to federal court based on diversity jurisdiction and filed a counterclaim against Gist, General Southern Industries, and Warrior River (collectively "General Southern") for breach of contract, and alternatively, seeking damages based on quantum meruit, unjust enrichment, and promissory estoppel.

The parties filed cross-motions for summary judgment. The district court granted General Southern's motion for summary judgment with respect to Shub's breach of contract claim, concluding that the parties' express contract only required a commission in the event of a sale of the facility—not a lease. However, the district court denied General Southern's motion with respect to Shub's quantum meruit, unjust enrichment, and promissory estoppel theories. According to the district court, because the express contract governed only a sale of the facility, it did not preclude Shub's recovery for an implied contract based on the telephone agreement to pay a commission for a "transaction" regarding the facility, which included the lease. The district court also realigned the parties to make Shub the plaintiff and General Southern the defendant.[1]

---

[1]For convenience, we will refer to all of the appellants collectively as "General Southern" and all of the appellees collectively as "Shub," except where contextual accuracy requires

8

Shub's remaining claims were tried before a jury. At the close of all the evidence, the defendants moved for judgment as a matter of law on all of those claims. The district court denied the motion, and the jury returned a verdict in favor of Shub in the amount of $530,000. The district court entered judgment in favor of Shub in this amount, and the defendants renewed their motion for judgment as a matter of law and moved for a new trial. The district court denied those motions. General Southern's appeals.

## II.

General Southern first contends that the district court erred by denying its motion for judgment as a matter of law regarding Shub's implied contract, quantum meruit, unjust enrichment, and promissory estoppel theories. We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court. Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1275 (11th Cir. 2008). "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." Id. (internal quotation marks and citation omitted). "We will reverse only if the facts and inferences point overwhelmingly in favor of one party, such that

otherwise.

9

reasonable people could not arrive at a contrary verdict." Id. (internal quotation marks and citations omitted).

A.

General Southern argues that the district court erred by denying the motion for judgment as a matter of law on all of Shub's claims on the ground that the contract was void because Shub did not have an Alabama real estate license. General Southern argues that it was part of Shub's prima facie case to establish that he held an Alabama real estate license, and Shub has admitted that he did not and still does not have one. According to General Southern, this precludes Shub from recovering on any of his claims.

Alabama Code section 34-27-30 provides that it is "unlawful for any person [or] corporation . . . for a fee, commission or other valuable consideration . . . to do any of the following unless he or she is licensed under Articles 1 and 2 of this chapter." One of the prohibited activities is to "[p]rocure or assist in procuring prospects for the purpose of effecting the sale, exchange, lease or rental of real estate situated within the State of Alabama." Ala. Code § 34-27-30(8).

General Southern relies primarily on Applebaum v. Zeigler, 20 So. 2d 510 (Ala. 1945), for its contention that Shub had the burden of proving compliance with § 34-27-30, but that is not what Applebaum holds. In Applebaum the

plaintiffs' complaint specifically alleged that they were licensed real estate brokers. Id. at 510. Because of that allegation the court held that "[t]he burden was on the plaintiffs under the averments of the complaint to show that . . . they were licensed brokers." Id. at 511 (emphasis added). Thus, Applebaum supports the proposition that a plaintiff alleging that he is a licensed broker bears the burden of proving his allegation. It does not, however, support the broader proposition that the plaintiff always bears the burden of demonstrating that he is a licensed broker. General Southern's additional reliance on Liles v. Flatley, 643 So. 2d 947 (Ala. 1994), and Waldorp v. Langham, 69 So. 2d 440 (Ala. 1953), is also unavailing. These cases only echo the well-settled rule under Alabama law that a contract by an unlicensed broker involving the activities listed in § 34-27-30 is void and unenforceable. See Liles, 643 So. 2d at 948; Waldorp, 69 So. 2d at 440. They do not, however, discuss which party has the burden of demonstrating compliance, or lack of compliance, with § 34-27-30.

A review of Alabama law on this issue supports the opposite conclusion—that the lack of a license is an affirmative defense. The most direct support is found in Garber v. Yeend, 17 So. 2d 874 (Ala. Ct. App. 1944). There the court, applying an earlier version of Alabama's real estate broker licensure statute, held that the plaintiff's lack of a real estate license "was a defense that

11

should have been pleaded and proven by the defendant." Id. at 875.[2] Cases

involving § 34-27-30 have also discussed the lack of a license in terms of a

defense, albeit less directly. See Dorman v. Pan-American Investments, Inc., 625

F.2d 605, 607 (5th Cir. 1980) (holding that a party's third-party beneficiary status

was irrelevant to "the illegality defense" of the transaction having been through an

unlicensed real estate broker);[3] Dillard v. Pan-American Investment, Inc., 347 So.

2d 990, 990 (Ala. 1977) ("[The defendant] defended on the basis that [the plaintiff]

was not licensed as a real estate broker.").

Based on those decisions, we conclude that the lack of a real estate broker

license is an affirmative defense to a claim for breach of contract involving the

subject matter described in § 34-27-30. Federal Rule of Civil Procedure 8(c)

provides: "In responding to a pleading, a party must affirmatively state any

avoidance or affirmative defense, including . . . illegality . . ." Fed. R. Civ. P. 8(c).

As we have noted, this affirmative pleading requirement "serves the important

purpose of providing notice to the plaintiff and the court" of the defenses alleged.

---

[2] The Alabama courts have relied on cases applying earlier versions of the real estate licensure statute statute in their interpretation of § 34-27-30. See, e.g., Culverhouse v. Culverhouse, 420 So. 2d 33 (1982); Dillard v. Pan-American Investments, Inc., 347 So. 2d 990 (1977).

[3] We have adopted as binding precedent all of the decisions of the former Fifth Circuit issued before to the close of business on September 30, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

12

Pulliam v. Tallapoosa County Jail, 185 F.3d 1182, 1185 (11th Cir. 1999).  "An affirmative defense not pleaded in the defendant's answer is waived."  Troxler v. Owens-Illinois, Inc., 717 F.2d 530, 532 (11th Cir. 1983).  Here, the district court ruled that the defendants had not pleaded illegality under § 34-27-30 in their answer or in the pretrial order, and we review the district court's decision of this issue for abuse of discretion.  See Proctor v. Fluor Enterprises, Inc., 494 F.3d 1337, 1350 (11th Cir. 2007) (citing EEOC v. White & Son Enters., 881 F.2d 1006, 1009 (11th Cir. 1989).

In diversity actions the issue of waiver can become complicated when we must interpret state law in defining an affirmative defense.  See Proctor, 494 F.3d at 1351.  For example, "we look to state law to inform the determination of whether a certain defense is "any other matter constituting an avoidance or affirmative defense" under [Rule 8(c)]."  Id.  at 1350; see also  Troxler, 717 F.2d at 532 (examining Georgia law to determine whether statutory immunity was an affirmative defense under Rule 8(c)); Morgan Guaranty Trust Co. v. Blum, 649 F.2d 342, 344 (5th Cir. Unit B July 1981) (examining Georgia law to determine whether a provision of that state's corporation qualification statute was an affirmative defense under Rule 8(c)).  In the past, we have been more forgiving when considering whether a party's failure to plead an affirmative defense under

13

Rule 8(c)'s "any other matter" catch-all provision results in waiver. See Procter, 494 F.2d at 1351 (internal quotation marks omitted).

Here, however, General Southern argues that the contract is unenforceable under Alabama law because Shub was unlicensed. We construe this as an affirmative defense of illegality. Accord Smith Braedon Co. v. Hadid, 825 F.2d 787, 788 (4th Cir. 1987) (discussing similar real estate broker licensure requirements from Virginia, Maryland, and the District of Columbia in terms of "affirmative defense[s] of illegality."). Illegality is one of the defenses specifically enumerated in Rule 8(c), and as we have noted, "[t]he general rule of waiver is more easily applied when a party fails to set forth one of the nineteen defenses specifically listed in Rule 8(c)." Proctor, 494 F.2d at 1351.

The district court did not abuse its discretion in finding a waiver here. General Southern asserted thirty-five affirmative defenses in the answer. Among these were eleven of the nineteen defenses enumerated in Rule 8(c). Although General Southern threw a veritable book of defenses at Shub's counterclaim, it omitted a critical chapter by failing to assert illegality. The pretrial order is similarly devoid of any claim of illegality or any reference to Shub's failure to procure a license as required by § 34-27-30. No reference to § 34-27-30 was made in General Southern's motion for summary judgment.

14

General Southern's arguments that it sufficiently raised the illegality defense are unconvincing.  First, it points to the fact that it pleaded that Shub had failed to state a claim upon which relief can be granted.   This is not the same as pleading a defense of illegality.  Second, General Southern points to its contention in the pretrial order that implied contracts require proof of the same elements as express contracts.  That is not the same as asserting that an illegality defense under § 34-27-30 was an issue in the case.  See generally Miles v. Tennessee River Pulp and Paper Co., 862 F.2d 1525 (11th Cir. 1989) ("The purpose of the pretrial order is to narrowly outline the existing issues.").  Moreover, the citations accompanying that contention in the pretrial order are directed toward a wholly separate issue: Alabama law's contract formation requirements of offer, acceptance, consideration, and mutual assent.  See Steiger v. Huntsville City Bd. of Educ., 653 So. 2d 975, 978 (Ala. 1995); Ellis v. City of Birmingham, 576 So. 2d 156, 157 (Ala. 1991) (citations provided in the pretrial order).   The district court found that the pretrial order provided no notice of any defense regarding the lack of a license under § 34-27-30, and we agree.  Based on these circumstances, we cannot conclude that the district court abused its discretion in ruling that the defendants waived the defense of illegality for failure to procure a real estate license.

15

Because the affirmative defense of illegality was waived, we need not determine whether Shub's involvement in the transaction was sufficient for him to be considered as having acted as a "broker" for the purposes of Alabama law.

B.

General Southern next contends that the district court erred by denying its motion for judgment as a matter of law on Shub's implied contract claim. General Southern argues that, under Alabama law, the express contract between the parties bars an implied contract claim for a commission based on the lease of the facility because, according to General Southern, both agreements cover the same subject matter. Shub responds that the express and implied contracts cover different subject matter are distinct because the express contract provides for a commission only upon the sale of the Warrior River facility while the implied contract claim is based on a lease agreement.

It is well-settled under Alabama law that a party cannot recover under a theory of implied contract when an express contract exists covering the same subject matter. See, e.g., Vardaman v. Florence City Bd. of Educ., 544 So. 2d 962, 965 (Ala. 1989) (citations omitted). Although the district court agreed with Shub's distinction between the subject matters of the express and implied contracts in this case, that distinction is contrary to Alabama law. See Stewart v. Robertson, 490

16

So. 2d 13 (Ala. Civ. App. 1986). In the Stewart case the plaintiff real estate broker

had an express written agreement with the defendant sellers whereby the broker

was entitled to compensation upon "any sale or contract of sale." Id. at 16; see also

id. at 14. The sellers later entered into an option agreement with a prospective

buyer that provided the prospective buyer, in exchange for a fee, the option

purchase the land within ninety days. Id. at 14. The option was never exercised,

however, and the parties never entered into a sales contract for the property. Id.

The broker then sued to recover a percentage of the option agreement's fee that had

been paid to the seller. He contended that he was entitled to compensation based

on the services he performed for the sellers that led to the option agreement. Id. at

15. In rejecting that contention, the Alabama appellate court noted that generally

"one cannot recover under an implied contract when an express contract is in

existence." Id. at 15. The court then reasoned:

> In this case, an express contract provided that [the plaintiff] would be
> entitled to compensation only upon "any sale or contract of sale."
> There was no sale . . . He has no right to compensation.

Id. at 16.

We read Stewart as vindicating General Southern's argument that the subject

matter of the express contract at issue in this case is Shub's commission. We are

bound by the holding of the intermediate appellate court in Stewart absent a

"strong indication that the state supreme court would decided the matter differently." Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1086 (11th Cir. 2004); see also Silverberg v. Paine, Webber, Jackson & Curtis, Inc., 710 F.2d 678, 690 (11th Cir. 1983) ("A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise."). There is no such indication here.

Here, as in Stewart, there was an express agreement under which compensation was contemplated only upon an eventual sale. Gist's email confirming the agreement with Shub stated that Shub would be paid a commission "if [General Southern] sell[s] our plant at Warrior River Steel LLC, Cordova, Al. to [Shub's] interested buyer." Under Stewart an implied contract claim for compensation based on circumstances other than those contemplated in the express agreement involves the same subject matter. See Stewart, 490 So. 2d at 15–16. In Stewart it was an option agreement. Here it is the lease agreement. In both cases, however, the express agreement between the parties provided that compensation was due upon the sale of the property. Thus, under Stewart Shub's implied contract claim seeking compensation based on lease agreement is precluded. Although we may be sympathetic to Shub's situation, we must apply Alabama law

18

as the courts of that sate have declared it.  General Southern is entitled to judgment as a matter of law on Shub's implied contract claim.

Accordingly, the judgment of the district court is REVERSED and we REMAND for judgment to be entered in favor of General Southern.